# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| HARDY EXPLORATION & PRODUCTION (INDIA), INC., | : | | |
| | : | | |
| Petitioner, | : | Civil Action No.: | 16-140 (RC) |
| | : | | |
| v. | : | Re Document No.: | 1, 36, 37 |
| | : | | |
| GOVERNMENT OF INDIA, MINISTRY OF PETROLEUM & NATURAL GAS, | : | | |
| | : | | |
| Respondent. | : | | |

## MEMORANDUM OPINION

**DENYING PETITION TO CONFIRM ARBITRATION AWARD; DENYING AS MOOT PETITIONER'S MOTION FOR LEAVE TO FILE SUR-REPLY; DENYING AS MOOT RESPONDENT'S CROSS-MOTION FOR LEAVE TO FILE RESPONSE**

## I. INTRODUCTION

In 1997, Hardy Exploration and Production (India), Inc. ("HEPI") entered into a contract with the Government of India that would allow HEPI to search for and potentially extract hydrocarbons from an area off of India's southeastern coast. The contract provided that if HEPI found crude oil, it would have two years to ascertain if that oil was commercially viable, but that if it found natural gas, that assessment period would last for five years. HEPI discovered a reserve of hydrocarbons in 2006 and claimed that it was natural gas, entitling it to a five-year appraisal period. India disagreed, and after two years, it informed HEPI that its rights to the Block had been relinquished. When the Indian Government refused to change its position on the type of hydrocarbons that had been discovered, HEPI initiated arbitration proceedings pursuant to the contract. The Tribunal ultimately found in HEPI's favor and ordered India to allow HEPI back onto the Block for another three years to continue its assessment of whether the natural gas

it had discovered was commercially viable. The Tribunal also awarded HEPI interest on its original investment in the Block, as well as certain costs. India immediately appealed the award to the Delhi High Court, and HEPI filed a separate suit in the Delhi High Court to enforce the award. As far as the Court is aware, those cases remain pending. Three years after it had won the arbitral award, HEPI had still not been allowed back onto the Block, and therefore filed a petition for confirmation of its arbitral award in this court under the Federal Arbitration Act. India opposed the confirmation, claiming that the enforcement of the award's specific performance order would violate U.S. public policy, as would confirmation of the interest portion of the award, which India claimed is punitive and coercive, rather than compensatory. For the reasons set forth below, the Court finds that confirmation and enforcement of the specific performance portion of the award would violate U.S. public policy, and therefore, the Court declines to confirm that portion of the award. Additionally, the Court finds that granting the award of interest, which is predicated on India complying with an order that this Court cannot issued, would also violate U.S. public policy, and therefore declines to confirm that portion of the award as well.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case stems from HEPI's participation in a Production Sharing Contract ("PSC") with the Government of India for the extraction, development, and production of hydrocarbons in a geographic block found off the southeastern coast of India called CY-OS/2 (the "Block"). *See* Decl. of Ian MacKenzie ("MacKenzie Decl.") ¶ 3, ECF No. 1-2; *see generally* MacKenzie Decl. Ex. 2 ("PSC"), ECF No. 1-4. The PSC was originally entered into in November 1996 by three private companies; India's state-owned oil company, the Oil and Natural Gas Corporation Limited ("ONGC"); and "[t]he President of India, acting through the Joint Secretary, Ministry of

Petroleum and Natural Gas." PSC at 1. The PSC permitted the three private companies to explore the Block and, if they found commercially viable hydrocarbon reserves, to extract those resources under a production sharing arrangement. *See* Pet'r's Mem. Law Supp. Pet. to Confirm Arbitration Award ("Pet'r's Mem.") at 2–3, ECF No. 1-1; PSC arts. 14–15. While HEPI was not an original participant in the PSC, it acquired a 25% participation share from one of the original participants in 1997, and by August 2001, HEPI had acquired a 100% participation share in the PSC. *See* Pet'r's Mem. at 3; *see also* MacKenzie Decl. Ex. 1 ("Award") at 3, ECF No. 1-3; MacKenzie Decl. Ex. 4 at 1–2, ECF No. 1-6. HEPI then transferred 25% of its interest in the PSC to GAIL (India) Ltd, a state-owned retail gas processing and distribution company in India. MacKenzie Decl. Ex. 5 at 2, ECF No. 1-7. HEPI maintained a 75% interest in the PSC at all times relevant to this dispute. *See* Pet'r's Mem. at 4.

Each participant in the PSC entered the agreement at their own risk. If a participant discovered a reserve of hydrocarbons that was capable of being extracted and produced commercially, then it would be entitled to extract and produce the hydrocarbons, and would be entitled to keep a percentage of the hydrocarbons for itself, with the rest going to the Government of India. *See* PSC arts. 14–15. If participants' work on the Block yielded no commercially viable discovery, the participants would be entitled to no compensation for the investment they had put into the Block. *See* PSC art. 7.4 (providing that the contractor shall "conduct all Petroleum Operations at its sole risk, cost and expense and provide all funds necessary for the conduct of Petroleum Operations . . ." unless otherwise provided in the PSC); *see also* Award at 41 (observing that "[t]here is no dispute" that a contractor "is not entitled to any compensation if it is unable to get commercial discovery of the product within the period specified in the contract").

The PSC outlined the procedures the parties would follow in the event of a hydrocarbon discovery. *See* PSC art. 9. Under the PSC, after the discovery of hydrocarbons, the participants would enter into an appraisal period to determine whether the production of the hydrocarbons in the newly discovered reserve would be commercially feasible. *See* Pet'r's Mem. at 4; PSC arts. 9.5, 21.4.4. The PSC provided for appraisal periods of different lengths depending on the type of hydrocarbons discovered. If the discovery was crude oil, the appraisal period would be two years, *see* PSC art. 9.5; if it was natural gas, the appraisal period would be five years, *see* PSC art. 21.4.4.

In late 2006, HEPI and GAIL discovered a reserve of hydrocarbons and promptly informed the Ministry of Petroleum and Natural Gas of their discovery. Pet'r's Mem. at 4; Award at 7–8. HEPI believed that the hydrocarbons it had discovered was natural gas, and more particularly, Non-Associated Natural Gas ("NANG"), and therefore that its declaration of commerciality would not be due until January 7, 2012. *Id.* at 6–7, 9–11. However, the Ministry insisted that the discovery was in fact crude oil, and accordingly that HEPI's declaration of commerciality was due on January 7, 2009. *Id.* at 9–11. Therefore, the Ministry informed HEPI via letters dated February 20 and March 23, 2009, that HEPI's rights to the Block were relinquished due to its failure to submit its declaration of commerciality on time. *Id.* Despite HEPI's efforts to convince the Ministry over the next year that its discovery was natural gas and therefore that it had not missed its deadline to file a declaration of commerciality, India would not yield. *Id.* at 5. Therefore, HEPI initiated arbitration proceedings pursuant to Article 33 of the PSC to resolve the question of which assessment period applied to the discovery of relevant hydrocarbons in the Block. *Id.* at 4. A tribunal of three former Chief Justices of the Supreme Court of India was empaneled to preside over these proceedings. *Id.* at 5.

Article 33 of the PSC provides that "any unresolved dispute, difference or claim which cannot be settled amicably within a reasonable time may . . . be submitted to an arbitral tribunal for final decision," PSC art. 33.3; sets forth the procedures for any arbitration; and selects Kuala Lumpur, Malaysia as the venue for the proceedings, PSC art. 33.12. Article 33 further provided that "[t]he decision of the arbitral tribunal, and, in the case of difference among the arbitrators, the decision of the majority, shall be final and binding upon the Parties." PSC art. 33.8.

The Tribunal first turned to preliminary issues, and issued an order on May 28, 2011 finding that the dispute between the parties was subject to arbitration and within the Tribunal's jurisdiction. *See* MacKenzie Decl. Ex. 7, ECF No. 1-9; *see also* Award at 5. The Tribunal heard argument on the merits of the dispute on August 20–22, 2012, in Kuala Lampur, Malaysia. Award at 5. During the course of these proceedings, HEPI presented the testimony of two expert witnesses to support its contention that the discovery was of natural gas, and India produced no expert testimony to the contrary. *Id.* at 26–29. On February 2, 2013, the Tribunal, still sitting in Kuala Lampur, issued a unanimous 43-page Award to HEPI, finding that "the nature of the discovery in the Block . . . would unequivocally qualify under the term of the [PSC] as Non Associated Natural Gas." *Id.* at 29. Because the discovery was natural gas, not crude oil, the Tribunal decided that HEPI was "denied the time provided for in the contract for appraisal and to come to [a] conclusion about the commerciality of the discovery." *Id.* at 36. The Tribunal concluded that severing HEPI's interest in the Block was "illegal, being on the erroneous impression that the discovery was Oil." *Id.* at 43.

To remedy what it found to be a breach of the PSC, the Tribunal ruled that India's "order of relinquishment is declared to be null and void." *Id.* Because India had ordered the relinquishment of the Block before HEPI was able to determine the commercial viability of the

hydrocarbons it had discovered, the full extent of the monetary damage to HEPI due to India's breach of the PCS remained unclear. *Id.* at 41. Therefore, the Tribunal ordered that "the parties shall be immediately relegated to the position in which they stood prior to the order of the relinquishment and the block shall be restored to [HEPI]." *Id.* at 43. Additionally, it ordered India to pay interest on HEPI's Rs. 500 crores investment in the Block, at a rate of 9% per year up to the date of the award, and 18% per year thereafter until the fulfillment of the award. *Id.* The Tribunal also awarded certain costs to HEPI. *Id.*

To date, the Government of India has only complied with the latter portion of the Award, the payment of Rs. 51 lakhs for India's share of the arbitration costs. *See* 4th MacKenzie Decl. ¶ 8, ECF No. 29-1. However, in order to challenge the other two portions of the award, India filed a petition with the Delhi High Court to invalidate the award in July 2013. *Id.* ¶ 9. In November 2013, HEPI filed a petition to enforce the award with the same court. *Id.* ¶ 10. After two years of delays, "counsel for GOI ultimately withdrew the [invalidation] petition on the grounds that it was not properly under the jurisdiction of the Delhi High Court," but rather that of the Madras High Court in Chennai, the high court geographically closest to the Block. *Id.* ¶ 14. However, less than a month later India filed a review petition seeking to reverse the order dismissing its action to invalidate the award. *Id.* ¶ 15. After the Delhi High Court dismissed this review petition in January 2016, India filed an appeal of the dismissal of the review petition. *Id.* ¶ 19–21. Following several adjournments at the request of India's counsel, the matter was heard in May 2016 and dismissed by the Delhi High Court, again on jurisdictional grounds, in July 2016. *Id.* ¶ 22. This time, however, the jurisdictional basis of the dismissal was not the fact that the high court in Chennai was the proper court to hear the case. Rather, it was because the Delhi High Court had found that the seat of arbitration had been Malaysia, rather than India, and therefore,

that Indian courts did not have the power to set aside the arbitral award pursuant to Section 34 of the Arbitration and Conciliation Act, 1996, India's statute governing arbitration. *See* 4th MacKenzie Decl. Ex. 5 ("Judgment")  at 17–22, ECF No. 29-6.

In October 2016, India filed for leave to appeal the dismissal with the Supreme Court of India. 4th MacKenzie Decl. ¶ 23. It also moved for the Supreme Court to stay the arbitration award, which the court denied. *Id.* Arguments on the appeal were delayed for almost a year due to the unavailability of India's counsel and the Supreme Court, and the docket in this case does not indicate whether the appeal has yet been fully heard, nor does it indicate whether the Supreme Court has ruled on the appeal. *Id.* ¶ 27. In the meantime, HEPI's petition for execution of the Award before the Delhi High Court has been repeatedly adjourned pending the disposition of India's appeal. *Id.* ¶ 28.

Due to this delay, HEPI decided to avail itself of the enforcement powers of this Court as well, and in January 2016 filed the instant petition for enforcement of the arbitral award. *See* Pet'r's Pet. to Confirm Arbitration Award ("Pet'r's Pet."), ECF No. 1. Following briefing and an order from this Court regarding proper service of India, India filed its response to HEPI's petition, arguing that the Court should decline to enforce the arbitral award because confirming both the specific performance and interest aspects of the Award would violate U.S. public policy. *See* Resp't's Resp. Pet'r's Pet. ("Resp."), ECF No. 28. It further moved for the Court to stay these proceedings while its petition to set aside the arbitral award remains pending in India. *Id.* HEPI's petition, and India's request that the Court stay these proceedings, are now ripe for decision.

### III. LEGAL STANDARD

"The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, also known as the 'New York Convention,' [21 U.S.T. 2517,] is enforced through the Federal Arbitration Act, 9 U.S.C. § 201 (2012)." *Matter of Arbitration of Certain Controversies Between Getma Int'l & Republic of Guinea*, 142 F. Supp. 3d 110, 112–13 (D.D.C. 2015). Under the New York Convention and the Federal Arbitration Act, a recipient of a foreign arbitral award may seek confirmation and enforcement of the award in U.S. federal courts. *See* 9 U.S.C. §§ 202, 207.

"Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court[,] . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Social Development Ltd. v. Government of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). Courts "may refuse to enforce the award [brought under the New York Convention] only on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (citation omitted); *see also Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 19 (D.D.C. 2011) (collecting cases). Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *DynCorp Aerospace Tech.*, 763 F. Supp. 2d at 20 (citing *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)). "[T]he burden of establishing the requisite factual predicate to deny confirmation of an arbitral award rests with the party resisting confirmation, and the showing required to avoid

summary confirmation is high." *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 247 (D.D.C. 2015) (alteration in original) (internal citations and quotation marks omitted).

## IV.  ANALYSIS

India has presented two major arguments for why HEPI should not be granted the confirmation it seeks. First, it argues that confirmation of the two remaining portions of the arbitral award—specific performance and interest—would violate U.S. public policy. *See* Resp. at 6–7. Second, it argues that if the Court finds that the award does not violate U.S. public policy, and therefore that it should be confirmed, the Court should stay the enforcement of the award while India's appeal of the award and HEPI's parallel litigation to enforce the award proceed through the Indian court system. *Id.* at 40. The Court first addresses India's arguments regarding a stay of these proceedings, and, finding that a stay is not warranted, then addresses India's arguments regarding whether confirmation of the award would violate U.S. public policy.

### A.  Request for Stay

India has moved for a stay of these proceedings pending the resolution of its appeal of the arbitral award in India pursuant to Article VI of the New York Convention, which provides that "[i]f an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award." New York Convention, art. VI. A "competent authority" referred to in Article V(1)(e) is one "of the country in which, or under the law of which, that award was made." New York Convention, art. V(1)(e). India further argues that this Court should stay the proceedings pursuant to the doctrines of *forum non conveniens* and international comity. *See* Resp. at 40. HEPI counters that because India brought a set-aside suit in India, rather than Malaysia, the requirements of an Article VI

9

stay have not been met. *See* Pet'r's Mem. P. & A. Resp. Resp't's Opp'n ("Pet'r's Resp.") at 34–

35, ECF No. 29. It further argues that *forum non conveniens* and international comity are not

available as defenses to enforcement actions in this Circuit. *See id.* at 23, 31–32. For the reasons

set forth below, the Court finds a stay of these proceedings unwarranted, and therefore denies

India's request.

      The D.C. Circuit has explained that "the FAA affords the district court little discretion in

refusing or deferring enforcement of foreign arbitral awards: the Convention is 'clear' that a

court 'may refuse to enforce the award only on the grounds explicitly set forth in Article V of the

Convention,'" and a court "may adjourn enforcement proceedings only on the grounds explicitly

set forth in Article V(1)(e) of the Convention." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d

724, 727 (D.C. Cir. 2012) (quoting *TermoRio S.A. E.S.P*, 487 F.3d at 935). While other circuits

have found that "a district court nevertheless retains the inherent authority to issue a stay for the

purposes of managing its own docket" in FAA cases, the D.C. Circuit has eschewed such

flexibility. *Cf. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1172

n.7 (11th Cir. 2004); *see also Hewlett–Packard Co. v. Berg*, 61 F.3d 101, 106 (1st Cir. 1995)

(concluding that a district court may consider staying a case in broader circumstances than those

found in Article VI of the Convention, but cautioning that the power to stay should be used

judiciously). As such, the Court is limited to granting stays only when "an application for setting

aside or suspension of the award has been made to a competent authority referred to in article

V(1)(e)"—that is, "a competent authority of the country in which, or under the law of which, that

award was made." New York Convention, arts. V, VI.

      India filed suit with the Delhi High Court to set aside the arbitration award in 2013, and

HEPI filed suit with the Delhi High Court to enforce the arbitration award, also in 2013. Pet'r's

Pet. at 5; Resp. at 13. The court dismissed India's set-aside action in July 2015, finding that it did

not have jurisdiction and that the action should have been brought in Chennai, which is the

locality closest to the Block. Resp't's Resp. at 13. India's request for reconsideration was denied

in January 2016, on the ground that Indian courts do not have the authority to set aside this

award. *Id.* India then appealed to the Indian Supreme Court, but the docket in this case does not

indicate that the Indian Supreme Court has ruled on the appeal in the set-aside case. *Id.* The

docket likewise does not indicate that the Delhi High Court has ruled on HEPI's petition to

enforce the arbitration award.

HEPI and India contest whether Indian courts have power under the New York

Convention to set aside the award, and therefore, whether a petition in India to set aside the

arbitral award counts as an application with "a competent authority of the country in which, or

under the law of which, that award was made." New York Convention, arts. V, VI; *see* Pet'r's

Mem. at 12–13; Resp. at 14–18. India argues that Indian courts are one such competent authority

because India was the country under whose law the arbitration award was made. Resp. at 14–18.

HEPI argues that "India has failed to initiate any action before the courts of a competent

authority, and therefore has no basis to apply for a stay" because Malaysian courts, rather than

Indian courts, are the only courts of competent authority to set aside the award. Pet'r's Resp. at

32.[1]

---

[1] Both parties have requested leave to submit additional briefing, along with expert affidavits, concerning the question of whether India is the competent authority to set aside the arbitration agreement, and therefore, whether the Court has the power to grant a stay of these proceedings. *See* Pet'r's Mot. for Leave to File Sur-reply, ECF No. 36; Resp't's Cross-Mot. for Leave to File Resp., ECF No. 37. As explained below, the Court ultimately finds that it can resolve the question of whether a stay should be granted without determining whether Indian courts have the authority to set aside the arbitral award, and therefore denies both parties' motions as moot.

If the Court were to find that Indian courts have the authority to set aside the award under the New York Convention, the Court would next turn to deciding whether a stay under these circumstances is proper. "A stay of confirmation should not be lightly granted," because "the adjournment of enforcement proceedings impedes the goals of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation." *Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 317 (2d Cir. 1998). Therefore, the Second Circuit in *Europcar* listed several factors for courts to consider when determining whether to stay arbitral enforcement proceedings, which courts in this district have chosen to apply on several occasions.

> *Europcar* instructs courts to look at:
>
> (1) the general objectives of arbitration—the expeditious resolution of disputes and the avoidance of protracted and expensive litigation;
> (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved;
> (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review;
> (4) the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute;
> (5) A balance of the possible hardships to the parties . . . ; and
> (6) Any other circumstance that could tend to shift the balance in favor of or against adjournment . . . .

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 134–35 (D.D.C. 2015) (quoting *Europcar*, 156 F.3d at 317–18). Additionally, the court in *Europcar* specified that

"[b]ecause the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards, the first and second factors on the list should weigh more heavily in the district court's determination." *Europcar*, 156 F.3d at 318. "A stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *Id.* at 317 (citing *Hewlett–Packard Co.*, 61 F.3d at 106).

Courts in this District have often utilized the *Europcar* factors in determining whether to grant a stay of arbitral enforcement proceedings. *See, e.g.*, *Hulley Enterprises Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269 (D.D.C. 2016); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179 (D.D.C. 2016); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013). While the D.C. Circuit has yet to explicitly adopt the *Europcar* factors, the Court will follow the lead of other courts in this District and analyze the prudence of a stay of these proceedings according to the *Europcar* factors.

The Court begins by considering the first and second *Europcar* factors, which "should weigh more heavily in the district court's determination," "[b]ecause the primary goal of the Convention is to facilitate the recognition and enforcement of arbitral awards." *Europcar*, 156 F.3d at 318. India claims that staying these proceedings would satisfy the first *Europcar* factor because a stay would further "the general objectives of arbitration – expeditious resolution of disputes and the avoidance of protracted and expensive litigations." Resp. at 42 (quoting *Europcar*, 156 F.3d at 317). India supports this claim by arguing that "[h]ere, the pending court proceedings in India could effectively and expeditiously resolve the issues of both confirmation and enforcement of the Award." Resp. at 42. India also claims that the second *Europcar* factor, "the status of the foreign proceedings and the estimated time for those proceedings to be resolved," *Europcar*, 156 F.3d at 317, also counsels in favor of a stay of these proceedings. Resp.

at 42–43. HEPI argues that these factors in fact counsel against a stay, because "[f]ar from offering speedy resolution, the Indian proceedings have been characterized by inordinate delay." Pet'r's Resp. at 36.

The Court agrees with HEPI's assessment of the timeliness of the Indian proceedings and the likelihood of their resolution in the near future. India filed its suit to set aside the arbitral award nearly five years ago, in July 2013. 4th MacKenzie Decl. ¶ 9. After several years of delay by both the Government of India and the courts, India's set-aside action was dismissed for lack of jurisdiction in July 2016. *Id.* ¶ 22. India appealed to the Supreme Court of India in October 2016. *Id.* ¶ 23. There is no indication on the docket that the Supreme Court has ruled on this appeal, which has been delayed over and over again due to the actions of the Government of India and the Supreme Court. *Id.* ¶¶ 23–27. Additionally, the parties have given no indication of how long they expect it will take the Indian court system to reach a final resolution in this case once the Supreme Court of India has determined whether the Delhi High Court has jurisdiction to hear the set-aside action on its merits, or whether only the courts in Malaysia do, forcing India to refile its suit there. Similarly, the parties have given no indication of how long they expect it will take for the Delhi High Court to reach the merits of HEPI's enforcement action, given that the courts have been inclined to postpone deciding that case until India's set-aside action has been resolved. *Id.* ¶ 28.

As HEPI has pointed out, courts in this district have readily found stays inappropriate when foreign set-aside proceedings have remained pending for half a decade. Pet'r's Resp. at 35–38. In *Chevron*, the court took into account the fact that the underlying arbitration had occurred over six years prior and the protractedness of set-aside litigation pending in The Hague when it decided not to stay its confirmation of Chevron's arbitral award. 949 F. Supp. 2d at 72.

Likewise, in *G.E. Transp. S.p.A. v. Republic of Albania*, the court took into consideration the fact that the arbitration process had commenced four years prior and the fact that appeal proceedings in Italy would likely not be completed for another four when it decided to confirm the arbitral award. 693 F. Supp. 2d 132, 138-139 (D.D.C. 2010). Here, the fact that the underlying arbitral award was rendered five years ago and the fact that there is no clear end to the Indian set-aside proceedings in sight counsels against granting India a stay.

Next the Court considers the third *Europcar* factor, which is "whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review." 156 F.3d at 317. India claims, without citation, that the award will be subject to more exacting scrutiny when an Indian High Court rules on HEPI's Indian enforcement action, because "Indian law permits courts to refuse confirmation and enforcement on public policy grounds that are broader than those permitted in the United States." Resp. at 43. It continues that "in order for an arbitral award to be confirmed and enforced in India and not be considered a violation of Indian public policy, it must meet four criteria: (1) compliance with Indian statutes and judicial precedents; (2) adherence to a 'judicial approach'; (3) compliance with 'Natural Justice'; and (4) reasonableness." *Id*. Conversely, this Court is only empowered to decline enforcement of this award if "[t]he recognition or enforcement of the award would be contrary to the public policy of th[is] country," because no other grounds for declining enforcement are applicable in this case. *See* New York Convention, art. V(2)(b). HEPI argues that India's standard for arbitral enforcement is irrelevant here, "since India is not a competent authority to set aside the Award." Pet'r's Resp. at 37. However, this argument misses India's point regarding how Indian courts will review the award in *enforcement* proceedings, rather than set-aside proceedings. While it would have been preferable for India to direct the Court toward

sources indicating that Indian courts have broader discretion when deciding whether to enforce arbitral awards, the Court will take India's word that Indian courts evaluate whether arbitral awards comport with Indian law when considering whether to enforce that award, a power that American courts do not have, until the award has actually been set aside by a competent authority. *See Four Seasons Hotels*, 613 F. Supp. 2d at 1369 ("A holding in an arbitration award that is contrary to the substantive law governing the arbitration is not a defense under the Convention, and therefore a district court generally may not review an arbitration award on the merits.") (citing *China Nat'l Metal Prods. Import/Export Co. v. Apex Digital, Inc.*, 379 F.3d 796, 799 (9th Cir. 2004)). Therefore, the third *Europcar* factor counsels in favor of a stay.

The fourth factor instructs the court to examine the characteristics of the foreign proceedings in several respects, including

> the characteristics of the foreign proceedings including (i) whether they were brought to enforce an award (which would tend to weigh in favor of a stay) or to set the award aside (which would tend to weigh in favor of enforcement); (ii) whether they were initiated before the underlying enforcement proceeding so as to raise concerns of international comity; (iii) whether they were initiated by the party now seeking to enforce the award in federal court; and (iv) whether they were initiated under circumstances indicating an intent to hinder or delay resolution of the dispute.

*Europcar*, 156 F.3d at 318. In this case, analysis of the first and third subfactors tug in both directions, as there are two cases regarding the arbitral award pending in India: one initiated by India to set aside the award (counseling against a stay) and one initiated by HEPI to enforce the award (counseling in favor of a stay). Both suits were filed prior to the filing of this case, counseling in favor of a stay. The fourth subfactor asks the Court to consider the motivations underlying the foreign proceedings, and consider whether they were commenced in good faith. India has provided no explanation for why, throughout its appeal, hearings repeatedly needed to

be continued because India's attorney was not prepared for the hearings. *See* 4th MacKenzie Decl. ¶¶ 9–27. While the Court acknowledges the right of the Indian government to challenge an arbitral award that it believes was unlawful, India's contributions to the protractedness of the litigation in the Indian courts cannot be denied. As such, the Court finds that overall, the fourth *Europcar* factor counsels against a stay.

The fifth factor likewise counsels against a stay. India's initial breach of its contract with HEPI occurred nine years ago, and the arbitral award in question was handed down five years ago. While the interest that HEPI was awarded through arbitration would continue to accrue in the event of a stay, there is no doubt that, given the length of time HEPI has waited to receive the award, and the amount of money at issue, HEPI would be burdened should the Court delay confirmation of the award. *See Chevron Corp.*, 949 F. Supp. 2d at 72. Last, pursuant to the sixth *Europcar* factor ("[a]ny other circumstance that could tend to shift the balance in favor of or against adjournment"), 156 F.3d at 317, the Court notes in particular the fact that the Supreme Court of India has already declined to stay the arbitration award pending India's appeal regarding the Delhi High Court's jurisdiction over the set-aside suit. *See* 4th MacKenzie Decl. ¶ 23; *see also G.E. Transp. S.p.A.*, 693 F. Supp. 2d at 139 ("Furthermore, the court notes that the Court of Appeals in Rome declined to set aside the Arbitral Award on an interim basis."). This Court is disinclined to question that assessment.

Overall, examination of the six *Europcar* factors demonstrates that a stay is not warranted in this case. Because the Court determines that the application of the six *Europcar* factors counsels against staying this enforcement action, the Court need not determine whether Indian courts, under Indian law, have the power to set aside the arbitral award. Because the Court need not determine the "seat" of the arbitration for the purposes of considering whether it will grant a

stay in this case, the Court need not consider the arguments raised in HEPI's proposed sur-reply and India's proposed sur-sur-reply. Because this is not a situation in which the "proposed surrepl[ies] would be helpful to the resolution of the pending motion," *Glass v. Lahood*, 786 F. Supp. 2d 189, 231 (D.D.C. 2011), the Court denies HEPI's motion for leave to file its sur-reply (ECF No. 36), and India's cross-motion for leave to a file a response to the sur-reply (ECF No. 37).

## B. The Arbitration Award

Having ruled against India's request to stay these proceedings, the Court now turns to HEPI's petition for enforcement of the Award. Because it has already received the costs portion of the arbitral award, *see* 4th MacKenzie Decl. ¶ 8, HEPI urges this Court to affirm and enforce the two remaining portions of the award: return of the Block to HEPI for a period of three years and interest on its original investment in the Block. India responds that the Court should decline to enforce these two components of the award on public policy grounds, as permitted by the New York Convention. *See* New York Convention, art. V(2)(b). First, it argues that because confirmation of the award "would not lead to the usual result this Court is used to seeing—a monetary judgment that the petitioner can then enforce against the sovereign nation's commercial assets located within the U.S.," but rather "would divest [India] of possession and control of its own territorial waters and natural resources," the confirmation "would be contrary to the public policy of [the United States]." Resp. at 19. It further argues against confirmation of the monetary portion of the award because "[t]he United States has clear public policy prohibiting punitive measures against foreign nations," and therefore it cautions against confirmation of an arbitral award meant to "punish[] India for its 'illegal acts' and any future

disobedience of its injunctive decree by ordering India to pay interest on a base amount unless and until it restores the Block to Hardy." *Id.* at 37–38.

As both parties acknowledge, the burden of demonstrating that the confirmation of an arbitral award would violate U.S. public policy is a heavy one. Analysis of a proposed public-policy defense "begins with the strong public policy favoring confirmation of foreign arbitration awards," *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 665 F.3d 1091, 1098 (9th Cir. 2011), because "[t]he goal of the [New York] Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 520 n.15 (1974). Due to the "'emphatic federal policy in favor of arbitral dispute resolution' . . . the FAA affords [a] district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd.*, 668 F.3d at 727 (quoting *Mitsubishi Motor Corp.*, 473 U.S. at 631). Courts in this circuit have repeatedly held that "courts should rely on the public policy exception only 'in clear-cut cases' where 'enforcement would violate the forum state's most basic notions of morality and justice.'" *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016) (emphasis added) (citing *TermoRio S.A. E.S.P.*, 487 F.3d at 938); *see also Chevron Corp.*, 949 F. Supp. 2d at 69 (D.D.C. 2013) (citing *Parsons v. Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974)). The public policy defense under Article V(2)(b) of the New York Convention is to be construed narrowly and is available only where an arbitration award "tends clearly to undermine the public interest, the public confidence in the administration of the law, or

security for individual rights of personal liberty or of private property." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016). Such a public policy must be "explicit" and "well defined and dominant, and is to be ascertained by reference to the laws and legal precedents." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987). The "provision was not meant to enshrine the vagaries of international politics under the rubric of 'public policy,' " and it does not provide that awards that might contravene U.S. interests may be resisted on such grounds. *Parsons*, 508 F.2d at 974. The public policy exception cannot be used to simply question the merits of the underlying award. *See Chevron Corp.*, 949 F. Supp. 2d at 69.

Therefore, the Court must determine whether the confirmation of the specific performance and interest portions of the arbitral award violate the United States' most basic notions of morality and justice, defined by its laws and legal precedents.

### 1. Specific Performance

This case presents the Court with a unique opportunity to balance two important U.S. public policy values: respect for the sovereignty of other nations and respect for foreign arbitral agreements. India urges the Court to decline confirmation of the portion of the award ordering it to allow HEPI back onto the Block to continue its determination of whether the reserve of natural gas it discovered in 2006 is commercially viable, claiming that such a confirmation would be in violation of U.S public policy for several reasons. First, it claims that enforcement of the award would violate the U.S.'s clear public policy preference of respecting the sovereignty of foreign nations, including their right to control their own lands and national resources. Resp. at 19. Second, it claims that the specific performance portion of the award was granted in contravention of Indian law, which prohibits the granting of specific performance other than in limited

circumstances. *Id.* at 31. Third, it claims that an order confirming the arbitral award would be too difficult to enforce and supervise. *Id.* at 35. Fourth, it argues that enforcement of the award would violate the doctrines of comity and act of state. *Id.* at 26.

In response, HEPI argues that India overstates the affront confirmation of the award would be to India's sovereignty, and also overstates the hesitancy of U.S. courts to hold foreign governments accountable when they harm private parties. *See* Pet'r's Resp. at 15–23. It also contends that India's emphasis on its belief that the award violates Indian statute is an attempt to reargue the merits of the arbitration award, something this Court is not allowed to consider. *Id.* at 25. It further argues that compliance with the award would not be too difficult to supervise, and that the doctrines of comity and act of state are inapplicable in arbitration award confirmation cases. *Id.* at 23–24.

Despite HEPI's examples to the contrary, the Court finds that India does not overstate the United States' public policy interest in respecting the right of other nations to control the extraction and processing of natural resources within their own sovereign territories. The Court therefore finds that India has met its burden of demonstrating that confirmation of the specific performance portion of the award would be contrary to U.S. public policy, and therefore the Court declines to confirm this portion of the award. Because the Court declines confirmation of the award on this ground, it does not reach India's other arguments as to why the Court should decline to confirm this portion of the award.

There is no doubt that "[a]ctions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States" and other nations. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983). That is why "[o]ur courts have understood, as international law itself understands, foreign nation states to be 'independent sovereign' entities.

To grant those sovereign entities an immunity from suit in our courts both recognizes the 'absolute independence of every sovereign authority' and helps to 'induc[e]' each nation state, as a matter of 'international comity,' to 'respect the independence and dignity of every other,' including our own." *Bolivarian Republic of Venezuela v. Helmerich & Payne Intern. Drilling Co.*, 137 S. Ct. 1312, 1319 (2017). This respect for the independence and dignity of other nations includes respect for their territorial integrity.

The United States' recognition and respect of other nations' sovereignty is expressed through the Foreign Sovereign Immunities Act, which provides that "foreign state[s] shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in" three subsequent subsections of the Act. 28 U.S.C. § 1604. One such exception enumerated in the Act is when a party seeks to enforce a foreign arbitration agreement or have a foreign arbitral award confirmed, as HEPI has done here. *See* 28 U.S.C. § 1605(a)(6). Neither this exception nor any of the others listed in the FSIA specifies whether U.S. courts' jurisdiction extends to awards of specific performance to be completed outside the territorial jurisdiction of the United States, or indeed, even within the territorial jurisdiction of the United States. Therefore, the crucial question for this Court to consider is whether the enforcement of an arbitral award granting specific performance against a foreign sovereign, and extraterritorial specific performance at that, would undercut American public policy, as expressed through the FSIA and other treaties regarding the liability of foreign nations to which the United States is a party.

To counter India's contention regarding U.S. public policy, HEPI first points out that courts have in the past enforced arbitral awards for specific performance in other countries, and that therefore, confirmation of arbitral awards that grant extraterritorial specific performance do

not violate U.S. public policy. *See* Pet'r's Resp. at 20–21 (citing *NTT DoCoMo v. Ultra d.o.o.*, No. 10-cv-3823, 2010 WL 4159459, at *3 (S.D.N.Y. Oct. 12, 2010) (enforcing award requiring foreign party to stock purchase agreement to perform its purchase obligations*); Four Seasons Hotels*, 613 F. Supp. 2d at 1369 (confirming award providing injunctive relief and specific performance of management agreement relating to a hotel in Venezuela)). However, as India indicates, both of these confirmations of awards ordering extraterritorial specific performance were against private corporations, rather than foreign nations. As such, these district court cases do not convince the Court that confirmation of this award would not violate U.S. public policy's respect for national sovereignty.

HEPI also highlights two instances in which American courts granted specific performance against defendant sovereign nations outside of the international arbitration context. In *Chabad v. Russian Federation*, a court in this district ordered Russia to "surrender to the United States Embassy in Moscow or to the duly appointed representatives of . . . Chabad . . . the complete collection" of certain expropriated religious texts and artifacts in Russia's possession. 915 F. Supp. 2d 148, 150–52 (D.D.C. 2013). HEPI argues that this case demonstrates that "U.S. courts have not hesitated to order extraterritorial specific performance or injunctive relief against foreign states." Pet'r's Resp. at 21. However, after Russia had refused to comply with the order, and after the plaintiff had moved for the imposition of civil contempt sanctions against Russia, the United States filed a Statement of Interest, explaining that while the government was actively working through diplomatic channels to recover the artifacts in question, it believed that the FSIA "does not permit a court to compel compliance with a specific performance order regarding property held by a foreign sovereign within the sovereign's own territory," and also that "the provision of such relief would be contrary to the foreign policy interests of the United States."

23

Statement of Interest of the United States, *Chabad v. Russian Fed'n*, No. 05-1548, Aug. 29, 2012, ECF No. 111 at 2. The United States Government highlighted that "FSIA's exceptions from execution immunity apply only to a foreign state's 'property in the United States,' and even that property is subject to execution only in carefully circumscribed and extremely limited circumstances." *Id.* at 6 (quoting 28 U.S.C. § 1610(a)). It further highlighted that many circuit courts have found the language of 28 U.S.C. § 1610(a) referring only to the execution against property "in the United States" to be significant. *Id.* at 5 (citing, for example, *Autotech Tech. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007) ("The FSIA did not purport to authorize execution against a foreign sovereign's property, or that of its instrumentality, wherever that property is located around the world. We would need some hint from Congress before we felt justified in adopting such a breathtaking assertion of extraterritorial jurisdiction.")). The United States therefore concluded that, without this limitation, judicial seizure of the property of a foreign state may well "be regarded as an affront to its dignity and may affect [the U.S.'s] relations with it." *Id.* at 6–7 (quoting *Republic of Philippines v. Pimentel*, 553 U.S. 851, 866 (2008) (internal quotation and ellipses omitted)).[2]

While the injunction in *Chabad* stemmed from a suit seeking the return of expropriated property, the limited language of 28 U.S.C. § 1610(a) also applies when "the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement." 28 U.S.C. § 1610(a)(6). As such, the Court finds that the policy interests expressed by the United States in *Chabad* are also relevant in this case, which concerns an order

---

[2] The district court ultimately granted Chabad its sanctions, despite the United States' objection, *see Chabad v. Russian Fed'n*, 915 F. Supp. 2d 148 (D.D.C. 2013), and because Russia was in default, it never appealed.

that would deprive a foreign nation of the ability to decide who will be able to extract and utilize its natural resources.

The second case HEPI cites is also relevant, but ultimately does not convince the Court that HEPI must prevail. *See* Pet'r's Resp. at 22. In *NML Capital v. Argentina*, the Second Circuit affirmed a district court's orders permanently enjoining Argentina from making payments on bonds issued pursuant to its debt restructurings without making comparable payments on defaulted bonds. 699 F.3d 246, 261–65 (2d Cir. 2012). In that case, the court awarded specific performance because it had found that money damages would be an insufficient remedy for the plaintiffs. In justifying this remedy, the court further reasoned that even though the court was prohibiting Argentina from transferring money to some bondholders before it had paid others, the injunctions were permissible because they could "be complied with without the court[] ever exercising dominion over sovereign property." *Id.* at 262–65. Additionally, "[t]he [i]njunctions d[id] not require Argentina to pay any bondholder any amount of money; nor d[id] they limit the other uses to which Argentina may put its fiscal reserves." *Id.* at 263. Nevertheless, the injunctions against Argentina were extraordinary to the extent that they prevented a sovereign nation from spending its money in the way that it saw fit, and indeed demonstrated that in some particular instances, U.S. courts have chosen to exercise their authority in a manner that contravenes usual notions of nations' rights to control what occurs within their borders.

India argues that a confirmation of the award would go even farther than the injunction in *NML Capital*, because it would require "India to give possession of its territorial waters to Hardy and permit Hardy to commercially develop India's natural resources." Resp. at 19. While the Court questions this assertion—after all, the PSC specifies that "India's natural resources remain vested in India . . . and subject to its control . . . , while HEPI bears the status of a 'Contractor'

with limited rights and obligations enumerated in the PSC," Pet'r's Resp. at 20—the Court nevertheless finds that this infringement on India's national sovereignty would contravene the United States' public policy interest in respecting the territorial integrity of other nations for several reasons.

First, the Court agrees with India that confirmation of the award would lead to a U.S. court attempting to enforce an even more invasive order than the one in *NML Capital*. While the Court does not agree with India's contention that enforcement of the arbitral award would be too complicated for the Court to oversee,[3] nor does the Court agree that allowing HEPI back onto the Block to continue its commerciality assessment would give HEPI full "possession" of the Block, it does find that forced interference with India's complete control over its territory violates public policy to the extent necessary to overcome the United States' policy preference for the speedy confirmation of arbitral awards. After all, the issuance of "extraterritorial injunctions often raise serious concerns for sovereignty and enforceability which compel denial." *Nguyen Thang Loi v. Dow Chem. Co. (In re Agent Orange Prod. Liab. Litig.)*, 373 F. Supp. 2d 7, 45 (E.D.N.Y. 2005). The power to grant extraterritorial injunctions "should be exercised with great reluctance when it [would] be difficult to secure compliance . . . or when the exercise of such power is fraught with

---

[3] India emphasizes the complexity of the PSC and the involvement of entities not party to this suit to demonstrate "that any attempt to require specific performance of the PSC or to supervise specific performance of the PSC would be a fools-errand." Resp. at 34. However, this contention misconstrues the extent of the arbitral award, and therefore, what this Court would actually be enforcing if it confirmed the award. Confirmation of this award would not require the Court to supervise the remainder of the process provided by the PSC. It would only require that the Court ensure that HEPI is allowed back onto the Block to pick up where it had left off in 2009. If India violates any other portion of the PSC, that violation would not be covered by the initial arbitration award, and therefore would not be subject to this Court's jurisdiction. The fact that ONGC and GAIL have expressed their disapproval of HEPI's attempt to confirm the arbitral award in the United States does, however, indicate that the Government of India alone may not be able to grant HEPI the full relief contemplated in the arbitral award. *See* Bravin Decl., Exs. 5 & 6, ECF No. 28-1.

possibilities of discord and conflict with the authorities of another country." *Id.* (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 647 (2d Cir.1956)).

Second, the Court is persuaded that the FSIA's contemplation of jurisdiction over foreign countries in suits seeking compensatory (but not punitive) damages, and allowing for specific, domestic methods of ensuring that plaintiffs receive those damages, demonstrates the United States' public policy commitment to respecting the sovereignty of foreign nations by only holding them liable for certain forms of relief. *See, e.g.*, 28 U.S.C. § 1606 (providing that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state . . . shall not be liable for punitive damages"); 28 U.S.C. § 1610(a)(6) (providing that "[t]he property *in the United States of a foreign state* . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . . , if . . . the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement") (emphasis added). While the FSIA grants federal courts jurisdiction over arbitral award confirmation proceedings, 28 U.S.C. § 1605(a)(6), and therefore the Court has clear jurisdiction over this case, the spirit of the United States' policy preference against specific performance is clear from the exclusion from the statutory text of any mention of specific performance or extraterritorial enforcement, apart from the terrorism and expropriation exceptions. *See* Resp. at 21–22 n.9 (citing to 28 U.S.C. § 1605(a)(3) and 28 U.S.C. § 1605A).

Third, while the doctrine of international comity does not generally counsel against the confirmation of arbitral awards, *see Newco Ltd.*, 650 Fed. Appx. at 16 (citing *Belize Soc. Dev.*, 668 F.3d at 727), as India has indicated, confirmation of this award would "raise the specter of

the opposite situation coming to pass; namely, a foreign court confirming (or the court going further and granting injunctive relief directly) against the United States for acts it has taken within its own borders or respecting its own territory." Resp. at 27. Given that the United States has not waived its sovereign immunity in its own courts against specific performance in contract cases, it would defy comprehension that it would be in compliance with U.S. public policy to create a situation in which a *foreign* court could order the U.S. to specifically perform its portion of a contract. *See e.g.*, *Gonzalez & Gonzalez Bonds & Ins. Agency, Inc. v. Dep't Homeland Security*, 490 F.3d 940, 943 (Fed. Cir. 2007) ("In order for a [contract] claim to be brought under either the Tucker Act or the Little Tucker Act, the claim must be for monetary relief; it cannot be for equitable relief, except in very limited circumstances . . ."); *Robbins v. U.S. Bureau of Land Mgt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) ("We now join our fellow circuits in holding that the Tucker and Little Tucker Acts 'impliedly forbid' federal courts from ordering declaratory or injunctive relief, at least in the form of specific performance, for contract claims against the government"); *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982) (acknowledging the "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract" with the federal government); *cf. Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007) ("Since the Tucker Act grants consent for suits based on contract, this has been interpreted by these other courts to preclude under the APA contract claims of any kind, either for damages or specific performance. This court has acknowledged the issue but not squarely addressed it.")

For all of these reasons, the Court finds that enforcement of the specific performance portion of the arbitral award would violate United States public policy, and therefore, that this

case presents one of the limited circumstances under which a district court can decline to confirm and enforce a foreign arbitral award. Given that other recourse is still available to HEPI, through its litigation in the Indian courts, the Court declines to confirm this portion of the award.

### 2. Interest

India urges the Court to decline confirmation of the monetary portion of the arbitral award—interest on HEPI's Rs. 500 crores ($113 million) investment in the Block, at a rate of 9% per year up to the date of the award, and 18% per year thereafter until the fulfillment of the award—claiming that it is both coercive and punitive and therefore that its enforcement "would be contrary to the public policy of [the U.S.]." *See* Resp. at 37 (quoting New York Convention, art. V(2)(b)); Rejoinder at 9–10. HEPI disagrees with India's characterization of the awarding of interest as punitive, explaining that the interest was meant "to compensate HEPI for the deprivation of the marooned capital it had already sunk into the Block." Pet'r's Resp. at 27. HEPI does not directly address India's argument that the post-judgment interest portion of the award is coercive. The Court finds that even if the interest awarded by the Tribunal was meant to be compensatory rather than punitive, because this Court cannot enforce the primary component of the award (return of the Block to HEPI), and because the two components of the award are inextricably intertwined, the Court also cannot award interest predicated on compliance with that component of the award. To order otherwise would be to impermissibly coerce India into complying with an order that this Court has determined it cannot issue. The Court cannot coerce through an interest award an action that it cannot order directly.

As explained above, the New York Convention allows U.S. courts to decline enforcing a foreign arbitral award if the award "would be contrary to the public policy of [the U.S.]." New York Convention, art. V(2)(b). The Court has already established that confirmation of the

specific performance portion of the award would violate public policy. Now the Court must also determine whether confirming the contested monetary portion of the award, the magnitude of which depends on whether India complies with the specific performance portion of the award, also violates public policy. In answering this question, the Court is persuaded by the United States' prior contention that the substance of a proposed order awarding money damages, rather than its form, should control how a court considers that order. *See* Statement of Interest of the United States, *Chabad v. Russian Fed'n*, No. 05-1548, Aug. 29, 2012, ECF No. 111 at 7. In *Chabad*, the United States argued that even though the proposed contempt sanctions the court was considering had not been labeled as proposed orders for the attachment or execution on property, for all intents and purposes, the sanctions would have had the same effect as such orders, and therefore would violate the FSIA. *Id.* (citing *S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983) (explaining that "courts 'may not grant, by injunction, relief which they may not provide by attachment,' for the obvious reason that '[t]he FSIA would become meaningless' if the denomination of an order controlled over its substance")). While the district court ultimately rejected the United States' argument, finding that, under *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373 (D.C. Cir. 2011), it did have the authority to issue contempt sanctions, *Chabad*, 915 F. Supp. 2d at 148, the Court will still heed the United States' urging in *Chabad* to look at the functional effect of the proposed order before it, rather than just its form.

In this case, the practical effect of confirming the Tribunal's award of interest would be to coerce a foreign state into complying with a non-existent order from this Court, a non-existent order which, as explained above, would be a severe affront to India's sovereignty and would violate U.S. public policy. Even if the Tribunal did not intend its award of interest to be punitive,

confirmation of this award would leave India in a Catch-22 of either halting the accrual of interest by allowing HEPI back onto the Block—and thereby, effectively, complying with the arbitration award at the behest of this Court—or allowing the sum of money it owes to continue to grow. Indeed, due to the way the arbitration award was composed, there is no way for India to halt the accrual of interest against it, or indeed to even satisfy the award definitively, until it allows HEPI back onto the Block.

This portion of the award is so inseparable from the specific performance portion of the award, the confirmation of which would violate U.S. public policy, that the confirmation of the interest portion of the award must also be found, necessarily, the violate U.S. public policy. India may ultimately need to pay HEPI the millions of dollars in interest it now owes—but if it does, it will be because a court with the authority to enforce the entire arbitration award, including the specific performance portion, has ordered it to do so. Because this Court does not have such authority, it cannot order this payment.[4]

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** HEPI's Petition to Confirm Arbitration Award (ECF No. 1); **DENIES AS MOOT** HEPI's Motion for Leave to File Sur-Reply (ECF No. 36); and **DENIES AS MOOT** India's Cross-Motion for Leave to File a Response to HEPI's

---

[4] As explained above, the Court has found that the award's grant of post-judgement interest is impermissibly coercive because the amount of interest owed is predicated on how long it takes India to return access to the Block to HEPI, an action the Court cannot order India to take. While the Court does not make a finding on the coerciveness of the Tribunal's pre-judgment interest award, even if the Court were to find that such interest is not coercive, the Court still would not confirm that portion of the award. In its award decision, the Tribunal left open the question of how to calculate the 9% pre-judgment interest it was awarding. *See* Award at 41–43. India claims that the interest is compound, Resp. at 5 n.3, while HEPI contends that it is not, Pet'r's Resp. at 5 n.20, 27 n.49. Because the exact amount of money the Tribunal awarded remains undetermined, the Court would not confirm this portion of the award either.

Proposed Sur-Reply (ECF No. 37).  An order consistent with this Memorandum Opinion is

separately and contemporaneously issued.

Dated:  June 7, 2018                                      RUDOLPH CONTRERAS
                                                    United States District Judge